## Case No. 5,115.

In re FREYVOGEL.

[25 Pittsb. Leg. J. 109.]

District Court, W. D. Pennsylvania. 1878.

By SAMUEL HARPER, Register:

The assignee having sold encumbered property divested of encumbrances, the matter has been referred to me to ascertain liens and report distribution. The claimant upon the fund is Dominick Ihmsen, trustee for the City National Bank of Pittsburgh, who seeks to be paid the amount of four promissory notes made by the bankrupt to the order of, and endorsed by, John M. Freyvogel, the first dated March 30, 1875, for $4,000, the second dated April 8, 1875, for $2,600, the third dated May 11, 1875, for $2,443.33, and the fourth dated June 23, 1875, for $1,900; and all at four months, the aggregate amount being $10,933.33. It is claimed that these notes are secured by a mortgage given by the bankrupt, on the real estate sold by the assignee, dated February 2, 1875, for the payment of $11,000 in one year, "which amount is as collateral security for certain promissory notes held by the City National Bank which were discounted and renewed before date hereof for said H. A. Freyvogel, as will appear more fully on reference being had to said in part recited obligation."

The bond and mortgage are dated February 2, 1875, nearly two months prior to the date of the first note claimed on, and consequently the notes there described are not the notes now outstanding. The notes described in the bond are as follows: One dated October 19, 1874, for $2,000; one November 27, 1874, for $4,000; one December 5, 1874, for $2,600; and one January 8, 1875, for $2,433.33,—and all having four months to run. At the date of the mortgage the City National Bank held the four notes just described, which were made by the firm of W. J. Anderson & Co., of which the bankrupt was a partner, and endorsed by the bankrupt. The firm was then dissolved and proceedings were pending in the state courts for the settlement of its accounts. An arrangement was effected between the bank and Freyvogel, by which the latter executed the mortgage referred to and gave his individual notes, endorsed by his minor son, of even date, amount and time to run of the notes then held by the bank—which latter notes were to be surrendered to him. A large mass of testimony was offered, which I have labored in vain to put to some practical use. The question presented and urged with great zeal by the assignee's solicitor is, that the circumstances surrounding the mortgage constitute a new loan and that the new mortgage upon the faith of which the loan was contracted, is void under the provisions of the act of congress approved June 3, 1864, known as the "National Bank Act" [13 Stat. 107]. The 28th section (now section 5137 of the Revised Statutes) limits the real estate that may be held by a national bank, as follows: "First. Such as shall be necessary for its immediate accommodation in the transaction of its business. Second. Such as shall be mortgaged to it in good faith by way of security for debts previously contracted. Third. Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings. Fourth. Such as it shall purchase at sales under judgments, decrees, or mortgages held by such association, or shall purchase to secure debts due to said association. Such association shall not purchase or hold real estate in any other case or for any other purpose than as specified in this section; nor shall it hold the possession of any real estate under mortgage, or hold the title and possession of any real estate purchased to secure any debts due to it for a longer period than five years."

If the first position of the counsel be correct, the second must as a matter of course follow. If the facts show the transaction to be a new loan, they must also show that the debt, then existing, was paid; but the very first step in the transaction negatives such an idea. The preceding negotiation had for its object the securing of the debt for which the bankrupt was liable, and the testimony does not disclose a syllable as to an intent on the part of either the bank or Freyvogel to negotiate for the payment of that debt. It is true that Freyvogel testifies that it was his understanding that when he gave the mortgage and the new notes that the old ones were paid, but that it is only his understanding. He desired to use the old notes in his equity case against his partner, Anderson. The bank desired to have them paid, but Freyvogel was unable to pay them, and the mortgage security was agreed upon, and when given, the old notes were given up to him for the purpose for which they were desired. The mortgage itself negatives the idea of a new loan, and shows the fact of a subsisting debt. It reads "which amount is as collateral security for payment of certain promissory notes held by the City National Bank which were discounted and renewed before date hereof for said H. A. Freyvogel." And to the same effect is the bond: "which amount is payable to said trustee as collateral security for the payment of the following promissory notes, being renewals and discounts before the date hereof and on the respective dates of the same in favor of said Henry A. Freyvogel, the original endorser on said notes."

The mortgage speaks of notes "discounted and renewed," and the bond of "renewals and discounts," and both that such renewals and discounts were before the date of the bond and mortgage. It is true, that in neither the bond nor mortgage are the notes described as those of W. J. Anderson & Co., as should have been the case, but the mortgage describes them as having been discounted and renewed "for said H. A. Freyvogel, the original endorser on said notes." It is very evident, however, that the bond and mortgage refer to, and describe the old notes, and not the new notes substituted for them. The old notes were made by the

firm of W. J. Anderson & Co., to the order of H. A. Freyvogel, and by him endorsed, and it was perfectly proper for the mortgage to say that the notes had been discounted for the bankrupt, as the presumption is that the last endorser is the person for whom such obligations are discounted, and it was undoubtedly correct for the bond to say that the notes were "in favor of H. A. Freyvogel, the original endorser." Neither of these expressions could apply as well to the new notes, as they were made to the order of John M. Freyvogel. The conclusion is irresistible that the mortgage was given to secure the old notes, and not for the purpose of securing a new loan made at the time. The bankrupt, however, testifies very positively that it was his understanding that the transaction paid the old notes, and that he gave his bond and mortgage under those conditions. A personal knowledge of many years of Mr. Freyvogel, satisfies me that he was thoroughly conscientious in his testimony, but on some points he is flatly contradicted by the witnesses for the bank, some of whom —Ihmsen, Callery and Maginn, notably—I have intimately known equally long, and whom I am convinced testified fully as conscientiously. The bankrupt does not, however, detail any facts to sustain the idea of payment; nothing but his understanding and intention. Evidence of the intention of the parties at the time of the discounts, to consider the new notes as renewals of former notes preceding them in the series, is not admissible; for the question was one of fact, whether or not, they were renewals, and not what the parties intended or considered. Appeal of Bank of Commerce, 8 Wright [44 Pa. St.] 423. Hence the intention of the parties is not to govern the controversy, but the facts occurring at the time the transaction occurred. As already shown, the mortgage was taken to secure the old notes, an existing indebtedness. The bankrupt himself admitted the mortgage to be but security. That it paid the debt is not even pretended. Then, did the new notes pay the debt? Certainly there was no agreement expressed that they should have that effect. The existing debt having been secured by the mortgage, the old notes were surrendered by the bank to Freyvogel, that he might have the use of them in his equity suit against his partner, and the new notes were given as a mere matter of form; they were called "memorandum notes"; they were numbered and marked by the bank to correspond with the numbering and marking of the old notes. It is not pretended by the bankrupt that these notes paid the old ones. He merely alleges that when he gave the mortgage and new notes, he understood it to be payment. Both mortgage and notes entered into the payment, yet, as we have seen, the mortgage was unquestionably given as security for the old notes. There is nothing in the fact as detailed in the testimony, to warrant the understanding of the bankrupt as to the effect of the transaction.

Proof has been given of the various transactions with the bank when the memorandum notes fell due, and it is strongly urged that the facts show payment. When a note fell due, another was offered to the bank, discounted, and the proceeds placed to the credit of the bankrupt, who then lifted the matured note by his check. And this is claimed to be payment. But such a claim is not supported by authority. On the contrary, all the authorities show it to be renewal. In Hartly v. Kirlin, 9 Wright [45 Pa. St.] 54, affirming the court below, the judge used this language: "It is difficult to define exactly what a renewal is; so far as our opinion goes, we consider it an extension of credit—a new loan of the same credit formerly given—an agreement not to require to pay the due note by other funds, but for a consideration to extend the time of payment of the old debt, by fixing a new period, through a new note, for its payment. The old debt, not being paid except in form, no new fund passing into or out of the bank, lives again in the new, because by an actual payment it has never been ended." This language is appropriate to this case. There was only the form of payment by applying the proceeds of the new to the lifting of the old note—the debt all the time remaining unpaid. The substance of payment was never realized. When the mortgage was given, Freyvogel was indebted to the bank about $11,000, and that indebtedness has never been satisfied, and it is perfectly clear that nothing in the national bank act forbids the bank taking a mortgage securing for such a debt. The mortgage is clearly within the second clause of the 28th section of that act. The debt to secure which it was given was certainly "previously contracted," and the property was as certainly mortgaged to the bank "in good faith," thus fulfilling all the conditions of the law. Nothing, therefore, but the payment of the debt would discharge the security. There is no pretense that the debt was ever paid in substance, and nothing short of a positive agreement between the parties that the new notes should operate as payment, can discharge the debt. No such agreement is alleged.

Some testimony has been offered on the subject of usury, but as the fund in the assignee's hands is not sufficient to pay the debt when reduced by deducting the usurious interest, it is not necessary for me now to make any calculation to determine the actual amount of the debt. Should the bank seek to prove for the defect, the testimony will control the liquidation. I find that the bank is entitled to the whole fund.

John Barton, for assignee.
Chas. F. McKenna and M. W. Acheson, for City Nat. Bank.